## In re FLYBOY AVIATION PROPERTIES, LLC, Debtor.

### No. 13–55775–BEM.

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Oct. 24, 2013.

See also 2013 WL 5775061.

Leon S. Jones, Leslie M. Pineyro, Jones & Walden, LLC, Atlanta, GA, for Debtor.

James H. Morawetz, Office of U.S. Trustee, Atlanta, GA, for U.S. Trustee.

## ORDER GRANTING MOTION FOR AUTHORIZATION TO SELL REAL PROPERTIES FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS

BARBARA ELLIS–MONRO,
Bankruptcy Judge.

This matter came before the Court for consideration of Debtor's "Motion for Authorization to Sell Real Properties Free and Clear of Liens, Claims, Encumbrances, and Interests" (the "Motion"), [Doc. No. 46], the objections to sale by Richard Franck, Oliver Walter Propheter, Ken Franck, and Mathis Airpark Residences Association ("MARA"), and Debtor's responses thereto. [Doc. No. 50, 60, 71, 72, 76, 77, 81, 82, 83]. The Court held hearings on August 15 and 16, 2013, to consider the objection of Richard Franck, and on October 15, 2013 (collectively, the "Hearing"), to consider the additional objections filed by Ken Franck, Oliver Walter Propheter and MARA. A trial was also held in the related adversary proceeding

on September 23, 2013, captioned *Flyboy Aviation Properties, LLC v. Franck*, Adv. Pro. No. 13–5111 (the "Adversary"), to determine what interest, if any, Richard Franck has in Debtor's property.

Present at the Hearing were Plaintiff's managing member, Joe Voyles and counsel for the Debtor, Edward McCrimmon, Lisa McCrimmon, Leon Jones and Leslie Pineyro. Also present were objecting parties Ken Franck, Richard Franck (individually and as president of MARA), Oliver Walter Propheter, and their counsel, William Mitchell. After carefully considering the pleadings, the evidence presented and the applicable authorities, the Court enters the following findings of fact and conclusions of law in accordance with Fed. R. Bankr.P. 7052.

## I. Background

Debtor proposes to sell two pieces of real property: a 14.07 acre parcel located at 3747 Mathis Airport Drive, comprised of Mathis Airport (the "Airport"), and a 1.99 acre parcel adjacent to the Airport on which there are several airplane hangars. (the "Subdivision Property" with the Airport, the "Property"). [Ex. D–4, 5].[1] The proposed buyer, JEH Homes, LLC ("JEH Homes"), has offered the Debtor $90,000 per acre for the Property for a total purchase price of $1,446,147. JEH Homes proposes to turn the Property into a planned residential subdivision, razing the Airport and its facilities. The purchase price is the best offer Debtor has received in the last three and one-half years, although it is not sufficient to pay the two mortgages on the Property.[2] Debtor be-

---

1. Franck Exhibits are hereinafter referred to as "Ex. F———," Flyboy Exhibits are hereinafter referred to as "Ex. FB———", Debtor Exhibits are hereinafter referred to as "Ex. D———," and Individual Objector's Exhibits are hereinafter referred to as "Ex. O———."

2. Gwinnett Community Bank asserts a first lien on the property in the amount of $1,604,620.92, while the estate of Claudy John Mathis asserts a second and fourth priority lien in the amount of $1,119,681.70. *See* Proofs of claim 2, 4 and 5, Doc. No. 55.

lieves the offer represents the best price available for the sale of the Property and is in the best interest of the estate and its creditors.

Through the Motion, Debtor seeks entry of an order authorizing the sale of the Property free and clear of all liens, claims, encumbrances, and interests, and to disburse the sales proceeds as follows: 6% sales commission to Debtor's Broker, customary closing costs, and then all net proceeds less a $35,000 "carve-out" for the bankruptcy estate, to Gwinnett Community Bank to the extent of its secured claim and the remainder, to the estate of Claudy Mathis. [Doc. No. 75]. Each of the individuals who have objected to the sale (the "Individual Objectors"), assert that they hold easements to use the Airport taxiways and runways and, argue that Debtor cannot sell the Property free of their interests. MARA objects to the sale to the extent that JEH Homes would use Mathis Air Park Road, the private road through the Subdivision [3], without permission, burdening the residents of the Subdivision and trespassing on private property. [Doc. No. 77].

The parties agreed that all evidence submitted at each of the August 15 and 16 hearing, and the September 23 trial would be included in the record for the final hearing on the Motion held on October 15. The parties presented additional testimony and documentary evidence at the October 15 hearing.

This Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N). Venue is proper pursuant to 28 U.S.C. § 1409(a).

## II.   Facts

L.G. Mathis owned, in whole or in part, Mathis Airport until 1990 when he sold his remaining one-half interest to his brother C.J. Mathis. [Ex. F–11, F–12]. During the early 1980's, L.G. Mathis and Patrick McLaughlin began selling off lots in the Subdivision adjacent to the Airport. [Ex. F–16, 26; O–8]. As more fully set forth in the Trial Order, Oliver Walter Propheter ("Propheter") purchased property in the Subdivision in 1983, Richard Franck purchased property in the Subdivision in 2004 and 2005, Ken Franck bought property from Richard in 2005, and Debtor purchased a Subdivision lot and the Airport in 2004. [Ex. D–4; Ex. F–16, 23; FB–3, 7, 9].

In November, 2007, McLaughlin and L.G. Mathis deeded the private roads in the Subdivision to MARA. [Ex. FB–5; Ex. F–19]. MARA was incorporated approximately 21 days prior to receiving the quit claim deed (the "Quit Claim") for the roads and was created for that purpose. *See also*, Trial Order at 7–8. At the time MARA accepted the Quit Claim there were two lis pendens regarding the litigation over the use of the Subdivision roads (the "Road Litigation") of record. [Ex. D–8, 9]. MARA, through its President, Richard Franck, had actual knowledge of the Road Litigation at the time the Quit Claim was delivered. After twelve years of litigation in the Road Litigation and four days after MARA accepted the Quit Claim, a consent order was entered by the Superior Court of Forsyth County on November 28, 2007 (the "State Court Order"). [Ex. D–10; Ex. F–29] There is a county road, Mathis Airport Drive, which provides the general public access to the Airport.

---

**3.** Defined terms not otherwise defined herein shall have the meaning set forth in the October 11, 2013, Order entered in adversary proceeding number 13–5111, *Flyboy Aviation Properties, LLC v. Franck* (hereinafter, the "Trial Order").

Mathis Air Park Road begins on Mathis Airport Drive and ends in a cul-de-sac in the Subdivision. Mathis Air Park Road remains private. [Ex. O–1; D–10, 12; F–29].

As discussed in the Trial Order, Richard Franck purchased property from Musgrove and then purchased an additional half acre parcel of property from the executor of the Wilson estate. [Ex. O–3; FB–3]. *See* Trial Order at 8. The half acre parcel was owned by "Pappy" Tate and then sold to Mr. Wilson, predecessor in title to Richard Franck and then, Ken Franck. [Ex. O–2, 3]. This parcel was combined with the Musgrove property and then subdivided into four lots. [Ex. FB–12]. Lot # 4, which is now owned by Ken Franck, is made up of Musgrove property and the Wilson property and has a boundary on Mathis Air Park Road. [Ex O–4; FB–7, 12].

Exhibit O–5, is a document titled "Addendum to Settlement Statement," (the "Wilson Addendum"), which states:

> As part of consideration of this purchase and sale, Seller agrees that Purchaser shall be allowed to join taxiways to airport taxiways of Mathis Airport and to have use of landing strip; and Purchaser agrees that they will not operate an aircraft repair service on subject property so long as an aircraft repair service is maintained at Mathis Airport.

[Ex. O–5]. Richard Franck testified that he received a copy of the Wilson Addendum from Wilson's son when he purchased the property, and that he recognized the signature of Patrick McLaughlin. The Wilson Addendum is signed by Patrick McLaughlin, and is signed by one witness and a notary. There are blanks for the signatures of L.G. Mathis and Tom and Pat Wilson as well as for additional witnesses, to sign, however the only signatory to the document is Patrick McLaughlin.

The document is not dated, but does contain the following: "[a]s to Patrick E. McLaughlin, Sr., Signed, sealed and delivered in the presence of: this 23 day of August, 1983." The Wilson Addendum identifies McLaughlin and Mathis as Sellers and Tom and Pat Wilson as Purchaser. The deed from Tate to Wilson conveying the property that became part of Lot # 4 is dated July 20, 1998. [Ex. O–2].

Propheter testified that he received an easement from L.G. Mathis and Patrick McLaughlin when he purchased his property in the Subdivision in 1983. Propheter relies upon the sales contract for the purchase of his property in the Subdivision (the "Sales Contract") in asserting this easement. [Ex. O–8]. Mrs. Propheter stated that she was in charge of maintaining the couples' important documents which includes the Sales Contract, and that, the Sales Contract was maintained in a file at the Propheters' home. [Ex. O–8].

The Propheters are not pilots, have never owned a plane, do not have a hangar on their property and have never used the Airport property for flying. Since at least 1994, the Propheters have walked on the Airport property and used the Airport taxiways and runways for other recreational purposes. Mrs. Propheter is interested in taking flying lessons and Mr. Propheter has always had an intent to build a kit plane wanted to build one when he retires. The Propheter property has a ten foot driveway entrance and several large hardwood trees along the driveway. [Ex. D–13, 14, 15]. The Propheter property would have to be physically altered by cutting down trees and perhaps reconfiguring the house and garage on the property in order to taxi a plane from the property to Mathis Air Park Road.

Debtor has sought to sell the Property for three and one-half years and has engaged a commercial broker on two occa-

sions in that effort. Based on that experience, Debtor has concluded it is not feasible to sell the Property as an airport. Several witnesses testified that the area has changed substantially within the last twenty years and that numerous large housing developments have been built nearby. Debtor has no relationship with JEH Homes and the contract to sell the property (the "Contract") was negotiated at arms-length.

## III. Conclusions of Law

■ Section 363(b)(1) of the Bankruptcy Code provides for sales of property outside the ordinary course while section 363(f) provides the basis for selling property free and clear of interests other than the estates'. Section 363(f) provides as follows:

(f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). In order to satisfy the requirements of section 363(f), only one subsection must be satisfied. *See* 3 COLLIER ON BANKRUPTCY ¶ 363.06, p. 363–46 (16th ed. 2013); *In re Levitt & Sons, LLC,* 384 B.R. 630, 647 (Bankr.S.D.Fla.2008); *In*

*re Gulf States Steel, Inc. of Ala.,* 285 B.R. 497, 506 (Bankr.N.D.Ala.2002) *(citing In re WBQ Partnership,* 189 B.R. 97 (Bankr. E.D.Va.1995))*; see generally Reiter v. Sonotone Corp.,* 442 U.S. 330, 338–39, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). Debtor seeks approval of the proposed sale free and clear of liens, claims, encumbrances and interests based upon subsections (3) and (5) with respect to the claims of Gwinnett Community Bank, who asserts a first priority lien on the Airport Property and the estate of Claudy John Mathis, who asserts a second and fourth priority lien on the Airport Property.[4] Gwinnett Community Bank consented to the proposed sale and, because the value of the liens, as determined by section 506 of the Bankruptcy Code, is being paid, section 363(f)(3) provides authority for the Debtor to sell the Property. *See* 3 COLLIER ON BANKRUPTCY ¶ 363.06[4], p. 363–53 (16th ed. 2013); *Levitt,* 384 B.R. at 648 *(citing In re Collins,* 180 B.R. 447 (Bankr.E.D.Va. 1995)).

With respect to the Individual Objectors, Debtor relies on subsection (4) of section 363(f) to argue that because the easement claims are the subject of a bona fide dispute Debtor can sell the Property free and clear of the asserted interests. More specifically, Debtor disputes that the Individual Objectors hold easements and also disputes that the Debtor is bound by them, if they exist, because Debtor asserts that it is a bona fide purchaser for value that took without notice of the asserted interests and thus took free of them.

■ The Individual Objectors assert that their rights are not subject to a bona fide dispute and that the Debtor cannot sell free of their interests. The Individual Objectors rely on *Silverman v. Ankari (In*

---

4. The Court has made no determination of the extent, validity or priority of the liens of Gwinnett Community Bank or the Estate of C.J. Mathis.

*re Oyster Bay Cove, Ltd.),* 196 B.R. 251 (E.D.N.Y.1996), to assert that section 363(f) does not authorize sale free of an easement. In *Oyster Bay,* the Court noted that,

> the order to sell "free and clear" has no affect on the dedication of the road and the storm drain, which are easements that run *with* the land. Clearly, 11 U.S.C.A. § 363(f) and Bankruptcy Rule 6004, which refer to the sale of land "free and clear" from these "interests," are not intended to sever easements and other nonmonetary property interests that are created by substantive State law. Indeed, absent the consent of the owner of the easement **or the easement being in bona fide dispute, the Bankruptcy Code does not even allow the Bankruptcy Court to authorize a sale of the property "free and clear" of an easement.**

*Oyster Bay,* 196 B.R. at 255–56 (emphasis added). So it is possible to argue, as Debtor does, that if an easement is subject to a bona fide dispute then section 363(f)(4) provides authority to sell free of that interest. Notwithstanding, the Court advised the parties at the conclusion of the August 15–16, 2013, hearing that it would not rule on Richard Franck's Objection prior to determining "what interest, if any, Richard Franck has in Debtor's property." [Case No. 13–05111, Doc. No. 10, 14]. Thus, the Court tried this issue on September 23, 2013, and entered the Trial Order in which the Court determined that Richard Franck

did not have a prescriptive easement, an easement by necessity or implication or an easement created in the Declarations, but that Richard Franck did receive an express easement from Musgrove. This easement is not perpetual but is limited by its terms to the period in which the Airport is used as an airport. Consequently, Richard Franck's interest in Debtor's property does not impose a restriction on the possible sale of the Airport for use as something other than an Airport. See Trial Order.

Ken Franck and Propheter assert the same legal theories as Richard Franck in their objections to the sale.[5] The Court will now address each of these objections as well as the MARA objection.

### A. Ken Franck Objection

To the extent Ken Franck asserts an easement based upon his ownership of a portion of the former Musgrove property, his rights are the same as Richard Franck's. As detailed in the Trial Order, the Musgrove easement is not perpetual, but is limited to the time when the Airport is used as an airport and the owner of the Airport is free to sell the property even if that sale results in a change in use of the property. Ken Franck's arguments in favor of an easement by necessity or implication, an easement by virtue of the Declarations, or prescription[6] fail as set forth in the Trial Order.

---

**5.** Each of their objections state: "Richard Franck has laid out the background, arguments and conclusions of his easement claim and opposition to Debtor's Motion to Sell in his Claimant Franck's Brief in Opposition to Debtor's Motion for Authorization to Sell Properties Free and Clear ... rather than regurgitate that information, [movant] hereby incorporates Richard Franck's Brief, and all supporting documents, and other evidence/testimony that is presented in the ongo-

ing hearings." *See,* Doc. 71, 72. These objections were filed September 23, 2013, after additional notice of the proposed sale was provided in accordance with the Court's direction at the August 15–16 hearing.

**6.** There was no evidence whatsoever that Ken Franck provided notice of an adverse claim through repairs or otherwise. *See* Trial Order at pgs. 12–13.

Ken Franck testified that, in addition to receiving an easement from his brother (on the prior Musgrove property), he received an express easement from Mr. Wilson, the predecessor in title to the half acre parcel. Ken Franck makes this argument in reliance on the Wilson Addendum. Consideration of the Wilson Addendum requires that the Court consider the general rules of contract construction and interpretation which apply to express easements. *National Hills Exchange, LLC v. Thompson*, 319 Ga.App. 777, 778, 736 S.E.2d 480 (2013). Thus, for the Wilson Addendum to constitute a contract, (i) the parties must have been able to contract; (ii) there must have been consideration; (iii) the parties must have assented to the terms of the contract; and (iv) there must be a legal and operable subject matter. *See* Trial Order at 20; O.C.G.A. § 13–3–1. "It is well settled that an agreement between two parties will occur only when the minds of the parties meet at the same time, upon the same subject-matter, and in the same sense." *Cox Broad. Corp. v. Nat'l Collegiate Athletic Ass'n*, 250 Ga. 391, 395, 297 S.E.2d 733 (1982).

Much like the Declarations discussed in the Trial Order, the fact that all parties to the Wilson Addendum, especially those it is charged against, did not sign the document indicates that the parties did not assent to its terms or intend to convey the interest contemplated therein. *See* Trial Order at 21. Further, it is unclear how the Wilson Addendum relates to the sale of property from Tate to Wilson because the date McLaughlin signed the Wilson Addendum predates the conveyance from Tate to Wilson by almost 5 years. At the Hearing, Debtor objected to the authenticity of the Wilson Addendum. The Court overruled the objection because Richard Franck identified McLaughlin's signature and indicated that he received the document (a copy) from the executor of Wilson's estate. However, the document is not entitled to any evidentiary weight given the unexplained relationship to the sale to Wilson and lack of execution.

Furthermore, because an easement is an interest in land, it must comply with the Statute of Frauds and be "drawn and executed with the same formalities as a deed to real estate." *Lovell v. Anderson*, 242 Ga.App. 537, 539, 530 S.E.2d 233 (2000); *Dyer v. Dyer*, 275 Ga. 339, 341, 566 S.E.2d 665 (2002); *Barton v. Gammell*, 143 Ga.App. 291, 293, 238 S.E.2d 445 (1977) ("an easement created by agreement constitutes an interest in land requiring a writing within the Statute of Frauds, and subject to the rules governing the construction of deeds"). This means that in addition to having a legal description sufficient to identify the land to which the easement pertains, and signatures of the party against which the grant is charged, an easement must be in a recordable form in compliance with deed laws. *Id.; see also Central of Ga. R. Co. v. DEC Assoc., Inc.*, 231 Ga.App. 787, 790, 501 S.E.2d 6 (1998); O.C.G.A. § 13–5–30.; 1 PINDAR'S GA. REAL ESTATE LAW & PROCEDURE § 8:17 (7th ed.). For a deed to be enforceable in Georgia it must be an "original document, in writing, signed by the maker, and attested by at least two witnesses." O.C.G.A. § 44–5–30. Therefore, even if the easement did not fail because no contract was formed, it fails because it is not signed by both makers of the document, and is not attested by a second witness. As a result, the Wilson Addendum did not create an easement interest in the Airport Property. Thus, Ken Franck has no easement associated with the Wilson portion of Lot # 4, and his easement related to the Musgrove property terminates by its terms when the Airport is no longer used

as an airport. Consequently, his objection to the proposed sale is overruled.

## B. Propheter's Objection

Propheter relies on the Sales Contract and the "Special Stipulations" contained therein to argue that he has an unlimited perpetual easement to use the Airport Property. [Ex. O8]. The sixth special stipulation states, "[s]eller agrees that purchaser shall be allowed to join taxiways to airport taxiways of Mathis Airport and to have use of landing strip." The stipulation is one in a numbered list, signed by the sellers, L.G. Mathis and Patrick McLaughlin, and Propheter, as purchaser.

■ As discussed above, a deed to an interest in land must be an "original document, in writing, signed by the maker, and attested by at least two witnesses." O.C.G.A. § 44–5–30. Notwithstanding, no "magic words" are necessary to convey an easement, the Court instead looks to the intent of the parties. *Barton,* 143 Ga.App. at 294, 238 S.E.2d 445; *Dept. of Transp. v. Knight,* 238 Ga. 225, 228, 232 S.E.2d 72 (1977); *see also G.W. Featherston Min. Co. v. Young,* 118 Ga. 564, 45 S.E. 414 (1903); *Kiser v. Warner Robins Air Park Estates, Inc.,* 237 Ga. 385, 386, 228 S.E.2d 795 (1976).

■ The Special Stipulations which purport to create and convey an easement fail to do so because the document does not comply with O.C.G.A. § 44–5–30. [Ex. O–8]. While the contract is in writing, signed by both the sellers and the purchaser of the property, and gives a "key" to identifying the property in question as required under the Statute of Frauds, it was not witnessed by two other individuals. *See* Trial Order pg. 17; O.C.G.A. § 13–5–30;

*White v. Plumbing Distribs., Inc.,* 262 Ga. App. 228, 230, 585 S.E.2d 135 (2003).[7] Unlike the Addendum discussed in the Trial Order, there are no lines or space provided in the Special Stipulations for attesting witnesses or notaries. [Ex. F–17, 32]. Arguably, the lack of space for attesting witnesses indicates that the grantors did not intend for the Special Stipulations to constitute a recordable instrument for an interest in land. Because the document was not in recordable form, a transfer of an interest in land was not perfected. *See Lovell v. Anderson,* 242 Ga.App. 537, 539, 530 S.E.2d 233 (2000); *Blue Ridge Apartment Co. v. Telfair Stockton & Co.,* 205 Ga. 552, 559, 54 S.E.2d 608 (1949) ("In order that a deed may be properly entered of record it must be executed in the presence of at least two witnesses, but as between the parties it is binding without witnesses"). What remains is an executed contract between McLaughlin, Mathis, and Propheter, which survives the closing, and is chargeable against the grantors, but not against subsequent purchasers. *Hoover v. Mobley,* 198 Ga. 68, 31 S.E.2d 9 (1944) ("In the absence of any witness whatever, a deed signed by the grantor is binding between the parties thereto").

■ Further, even if the Special Stipulations conveyed an easement, because Propheter's recorded warranty deed does not reference an easement and the Sales Contract was not recorded, there is no evidence in the deed record of the Special Stipulations. Thus, unless Flyboy received notice of the asserted easement through physical features of the Propheter property, Flyboy would not be subject to the asserted easement. *See Webster v. Snapping Shoals Elec. Membership Corp.,* 176 Ga.App. 265, 266–67, 335 S.E.2d 637

---

7. This is in contrast to the Addendum which was executed by the grantor and grantees and two witnesses.

(1985) (citing *Mathis v. Holcomb*, 215 Ga. 488, 489–490, 111 S.E.2d 50 (1959)); *see also* Trial Order at 24–26.

■ The evidence showed that at the time of Flyboy's purchase, there was no hangar on the Propheter property and that the driveway was and is lined with large hardwood trees so that it is not possible to taxi a plane on the driveway. [Ex. D–13, 14, 15; Ex. O–1; Ex. F–2, 3]. In addition, the Propheter house and garage are situated on the lot in such a way that a plane could not be taxied to the back of the property. In contrast to the physical evidence of use of the Airport on the former Musgrove property, there were no physical features of the Propheter property to put Flyboy on notice that Propheter asserted an easement to use the Airport Property. *See Mize v. McGarity*, 293 Ga.App. 714, 667 S.E.2d 695 (2008); *Parrott v. Fairmont Dev., Inc.*, 256 Ga.App. 253, 568 S.E.2d 148 (2002).[8] Accordingly, even if the Special Stipulations were sufficient to create an easement (which they were not), Flyboy took free of the asserted interest because the Special Stipulations were not recorded when Flyboy purchased the Airport for value and there were no physical features of the Propheter property that created a duty to inquire beyond the deed records. O.C.G.A. § 23–1–17; *Parrott*, 256 Ga.App. at 255, 568 S.E.2d 148 (2002) (*citing Hopkins v. Virginia Highland Assocs., L.P.*, 247 Ga.App. 243, 541 S.E.2d 386 (2000)).

■ In his objection, Propheter also claimed an easement under the theory of easement by prescription, easement by necessity, and under the Declarations. *See* Trial Order. While the use of the Airport property occurred for the requisite time, there was no evidence whatsoever of any notice of adversity to the owners of the Airport. Testimony was that the Propheters never asked permission to use the Airport property because they assumed they had a right to do so under their purported easement. Propheter testified that he paid for paving the "neck" of Mathis Air Park Road and assisted with road maintenance. Notwithstanding, as was the case for Musgrove, the record is completely devoid of any notice of an adverse claim, or evidence of the width of the easement or any deviation in the amount appropriated. *See* Trial Order at pgs. 12–14. As to necessity, it is undisputed that the Propheters have ingress and egress from their property. Finally, the Declarations, as discussed in the Trial Order, do not convey any interest to Lot Owners. Thus, the Propheter claim to an easement fails and the Propheter objection is overruled.

### C.  MARA's Objection

MARA objects to the proposed sale "with an implied ownership or easement

---

8.  In Debtor's "Supplemental Hearing Brief in Opposition to Objection by Walter Propheter," it argues that to the extent Propheter has an easement, it has been abandoned by nonuse, to which Propheter vigorously objected to at the Hearing. [Doc. No. 81]. Georgia law "does not favor the extinguishment of easements, and an easement acquired by grant is not extinguished by mere nonuse; there must be clear, unequivocal, and decisive evidence of an intent to abandon the easement." *Whipple v. Hatcher*, 283 Ga. 309, 658 S.E.2d 585 (2008); *but see* O.C.G.A. § 44–9–6; *and Central of Ga. R. Co. v. DEC Assoc., Inc.*, 231 Ga.App. 787, 789–90, 501 S.E.2d 6 (1998) (finding that if an easement had existed in the case, it would have been abandoned by "compelling evidence," as "there was no evidence of use at any time" over twenty–five years). Considering there was evidence that the Propheters used the Airport Property for recreational purposes, the Court cannot agree that mere non-use of the Airport Property as an airport would amount to an abandonment if Propheter had an easement.

over the Private Road by the airport because it is neither fair nor equitable." [Doc. No. 77]. MARA argues that the Airport portion of the Property has no rights to use Mathis Air Park Road such that the planned development of a "play field" on the Subdivision Property would require use of the private road which would amount to a "taking without due process of law." *Id.* MARA further asserts that JEH Homes believes that the Airport property is entitled to use Mathis Air Park Road and that such use would be dangerous, as it frequently serves to taxi aircraft. MARA seeks a determination regarding ownership of Mathis Air Park Road. At the Hearing, MARA's counsel argued that, by virtue of the Quit Claim, MARA owns Mathis Air Park Road such that Debtor cannot not sell any interest in it.

In support of its objection, MARA makes several arguments regarding the proceedings in the Road Litigation prior to entry of the State Court Order and relies on a brief filed by plaintiffs in that action and the Georgia Court of Appeals opinion in *Durham et al. v. Mathis,* 258 Ga.App. 749, 575 S.E.2d 6 (2002). Most of that opinion addresses a gravel road between what has been referred to as the McLaughlin and Durham lots and is not relevant to Debtor's rights to, or in, Mathis Air Park Road. With respect to Mathis Air Park Road, the Court of Appeals held that the trial court's summary judgment order holding that, (i) Mathis Air Park Road was a public road, and (ii) all property owners whose lots "fronts on" Mathis Air Park Road owned to the center of the road were not supported by undisputed facts in the record such that those two rulings were reversed and remanded for trial. *Id.* at 754, 575 S.E.2d 6. Thus, the Court of Appeals did not address the issue of an alleged taking. The State Court Order was entered by the Superior Court

subsequent to the *Durham v. Mathis* decision.

A properly filed lis pendens puts the world on constructive notice of a pending suit, such that a prospective purchaser is subject to the court's final determination of the issues presented. O.C.G.A. § 44–14–610; *Baxter v. Bayview Loan Servicing, LLC,* 301 Ga.App. 577, 584, 688 S.E.2d 363 (2009) ("[o]ne who purchases the property with notice of the lis pendens [ ] is then bound to the outcome of the pending litigation, even though they were not otherwise a party to it"); *see also Boca Petroco, Inc. v. Petroleum Realty II, LLC,* 292 Ga.App. 833, 835, 666 S.E.2d 12 (2008) ("[t]he doctrine imputed to all third parties [gives] constructive notice of the litigation and of the claims against property being asserted in the pleadings and [binds] third parties to the outcome"); *see also Tinsley v. Rice,* 105 Ga. 285, 31 S.E. 174 (1898). Furthermore, a lis pendens serves to give notice of the court's "jurisdiction, power, or control [acquired] over property involved in a suit, pending the continuance of the action, and until the final judgment therein." *Coleman v. Law,* 170 Ga. 906, 154 S.E. 445, 448 (1930); *see also Boca Petroco* at 837, 666 S.E.2d 12 (stating that, "[the] object [of] the keeping of the subject, or res, within the power of the court until the judgment or decrees shall be entered, and thus to make it possible to give effect to [its] judgments and decrees.")

It is undisputed that MARA had actual and constructive notice of the Road Litigation and the claims asserted therein by virtue of the two lis pendens filed and its president's actual knowledge of the Road Litigation. [Ex. F–18, D–8, D–9]. MARA accepted the Quit Claim three days prior to the parties entering into the consent order ending the Road Litigation. [Ex. F19, FB–5, F–29, D–10]. The State Court

was aware of the Quit Claim and proceeded with trial notwithstanding MARA's receipt of the Quit Claim. [Ex. FB–84]. Only after two days of trial did the parties to the Road Litigation enter into a consent order. This consent order was then entered by the Superior Court and became the judgment of that Court. MARA has not appealed or otherwise challenged the State Court Order. *See* O.C.G.A. § 9–11–60(f). Thus, the State Court Order is controlling because two lis pendens were properly filed at the time of the Quit Claim such that any transfer or purchase of the property, which was the subject of the Road Litigation, during the pendency of that case is subject to the State Court Order. The State Court affirmatively determined the parties' rights in the State Court Order, and this Court will not review the State Court Order.[9] Consequently, this Court will not make a determination of ownership of or rights to use Mathis Air Park Road vis a vis the Airport property (as distinct from the Subdivision Property)[10] beyond that set forth in the State Court Order.

■ Further, a determination beyond the State Court Order is not necessary to rule on the Motion because the Debtor can only sell whatever interest it has; it cannot sell more. *See In re Southwest Florida Heart Group, PA,* 342 B.R. 639, 644 (Bankr.M.D.Fla.2006) *(citing, Connolly v. Nuthatch Assoc. (In re Manning),* 831 F.2d 205, 207 (10th Cir.1987) (stating that "it is self-evident that the Trustee can only sell property of the estate")); *In re Proveaux,* 2008 WL 8874286, 2008 Bankr.LEXIS 1327 (Bankr.D.S.C.2008); *see also In re Brubaker,* 443 B.R. 176, 181 (Bankr.M.D.Fla.2011) ("An elementary rule of bankruptcy.... is that the [ ] trustee succeeds only to the title and rights in the property that the debtor possessed") *(citing In re Raborn,* 470 F.3d 1319, 1323 (11th Cir.2006)).

■ Finally, MARA objects to the proposed sale because of the potential use of Mathis Air Park Road by JEH Homes. The potential use of Mathis Air Park Road by JEH Homes or residents of yet to be constructed homes does not provide a basis for the Court to sustain MARA's objection, because such a ruling would amount to an advisory opinion. *See Aetna Life Ins. Co. of Hartford, Conn. v. Haworth,*

---

**9.** The Rooker–Feldman doctrine does not apply in this case because MARA was not a party to the Road Litigation, however, because the State Court determined certain ownership interests in Mathis Air Park Road, the spirit of that doctrine would be violated by this Court's review of the State Court Order such that the Court, if it were necessary to resolution of the Motion, which it is not, would abstain from construing the State Court Order. *See, Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U.S. 280, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005); *In re Glass,* 240 B.R. 782, 786 (Bankr.M.D.Fla.1999) (noting that Rooker–Feldman does not bar a federal suit brought by an individual who was not a party to the state court action).

**10.** The State Court Order states in part: "Each owner of property and their successor in title bordering i.e. sharing a common boundary line with Air Park Road, also known as Mathis Air Park Road.... shall own fee simple title to the center of said Air Park Road which is adjacent and contiguous to said owner's property....Each owner of such property and their successor in title shall have easement for ingress and egress to such owners' property, as necessary, over other such owners' property and interest in said road...." [Ex. D–10; Ex. F–29]. Debtor owns a lot that borders Mathis Air Park Road. [Ex. O–1, F–23]. Thus, it would appear that Debtor has rights in that portion of Mathis Air Park Road that borders the parcels in the Subdivision. Although it is not entirely clear, it appears that MARA concedes this in its objection while disputing that Debtor has any rights to Mathis Air Park Road associated with the Airport property.

300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937) (exercise of judicial power is limited to cases and controversies.... a justiceable controversy is ... distinguished from a difference or dispute of hypothetical or abstract character). The Eleventh Circuit discussed this principle in *Hendrix v. Poonai*, stating that "an abstract question 'based on the possibility of a factual situation that may never develop'" is not a true controversy, for which a ruling would amount to an advisory opinion. *Hendrix v. Poonai*, 662 F.2d 719 (11th Cir.1981). At this point, all of the facts alleged are hypothetical. The property has not been sold. Redevelopment has not yet occurred. As a result, there is no particularized concrete injury occurring for the Court to review, and any opinion would amount to an impermissible advisory opinion. Since there is no relief that can be afforded MARA on its objection, it is overruled. Accordingly, it is now therefore,

ORDERED as follows:

1. The Motion [Doc. No. 46] is GRANTED to the extent set forth in this Order.

2. All objections not resolved or withdrawn are, for the reasons set forth herein, and in the Trial Order, overruled on the merits.

3. Adequate and sufficient notice of the Motion and the Hearing has been provided in accordance with § 102 of the Bankruptcy Code, Fed. R. Bankr.P.2002 and 9014, and no further notice of the Motion, the Hearing or entry of this Order is required.

4. The sale of the Property as provided in this Order reflects the exercise of the Debtor's sound business judgment and is in the best interest of the bankruptcy estate, Debtor and creditors.

5. Pursuant to §§ 105(a) and 363(f) of the Bankruptcy Code, upon the closing of the sale contemplated in the Motion, the Property shall be transferred to JEH Homes, free and clear of all Liens, Claims, Encumbrances, and Interests, with all such Liens, Claims, Encumbrances, and Interests to attach to the proceeds of the sale, with the same validity, enforceability, priority, force, and effect that they now have against the Property, subject to the rights, claims, defenses, and objections, if any, of Debtor and all interested parties with respect to such liens and claims.

6. On and after the closing of the proposed sale to JEH Homes, each of Debtor's creditors is authorized and directed to execute such reasonable documents and take all other actions as may reasonably be necessary to release Liens or Claims, if any, against the Property, as such Liens or Claims may have been recorded or may otherwise exist.

7. In the absence of a stay pending appeal, in the event that JEH Homes and Debtor elect to consummate the sale at any time after the entry of this Order then, with respect to the sale of the Property as authorized here, JEH Homes, as a purchaser in good faith within the meaning of § 363(m) of the Bankruptcy Code, shall be entitled to the protections of § 363(m) of the Bankruptcy Code if this Order or any authorization contained herein is reversed or modified on appeal.

8. The terms and provisions of the Contract, together with the terms and provisions of this Order, shall be binding in all respects upon, and shall inure to the benefit of, Debtor, its estate and creditors, JEH Homes, and their respective successors and assigns, and this Order shall be binding in all respects upon any affiliated third parties, and all persons asserting a Lien against, Claims or Interests in Debtor's estate or the Property. The sale of the Property, if consummated, shall be enforceable against and binding upon, and not subject to rejecting or avoidance by,

Debtor, or any chapter 7 or chapter 11 trustee of Debtor and its estate.

9. Any findings or conclusions read into the record by the Court at the Hearing that are not expressly set forth in this Order are hereby fully incorporated as if the same were set forth herein.

10. The fourteen (14) day stay period provided for in Bankruptcy Rule 6004(h) shall not be in effect with respect to the sale contemplated in the Motion and, thus, this Order shall be effective and enforceable immediately upon entry. Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay or risk its appeal being foreclosed as moot in the event JEH Homes and Debtor elect to close prior to this Order becoming a final order.

11. This Court's findings of fact and conclusions of law satisfy the requirements of Fed.R.Civ.P. 52 applicable herein by reason of Bankruptcy Rule 9014.

12. Debtor is directed to hold all proceeds of the sale contemplated in the Motion in escrow until any Motion for Adequate Protection asserted pursuant to 11 U.S.C. § 363(e) has been ruled upon.